UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------

CARL EVANS and REGINALD BENJAMIN,
Individually and on behalf of others        AMENDED VERIFIED
Similarly situated,                         COMPLAINT

                            Plaintiffs,     CV-15-03942

                -v-

THE STATE OF NEW YORK, ANDREW CUOMO,
Governor of State of New York; NEW YORK
EMPIRE STATE DEVELOPMENT CORPORATION,
HOWARD ZEMSKY, President and CEO of Empire
State Development Corporation; PORT
AUTHORITY OF NEW YORK & NEW JERSEY, PATRICK
J. FOYE, Executive Director of Port
Authority of New York & New Jersey;
DORMITORY AUTHORITY Of the STATE OF NEW
YORK, GERRARD P. BUSHELL, Executive
Director of the Dormitory Authority of the
State of New York; METROPOLITAN
TRANSPORTATION AUTHORITY, THOMAS F.
PRENDERGAST, Chief Executive Officer of
Metropolitan Transportation Authority; NEW
YORK CITY HOUSING AUTHORITY, SHOLA OLATOYE,
Chief Executive Officer of New York City
Housing Authority; NEW YORK CITY SCHOOL
CONSTRUCTION AUTHORITY, MELANIE LA ROCCA,
Executive Director of New York City School
Construction Authority; NEW YORK STATE
DEPARTMENT OF TRANSPORTATION, MATTHEW J.
DRISCOLL, Commissioner of New York State
Department of Transportation; NEW YORK CITY
DEPARTMENT OF TRANSPORTATION, POLLY
TROTTENBERG, Commissioner for New York City
Department of Transportation; UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY, GINA
McCARTHY, Administrator for United States
Environmental Protection Agency; UNITED
STATES DEPARTMENT OF DEFENSE, ASHTON B.
CARTER, the Secretary of Defense; UNITED
STATES ARMY CORPS OF ENGINEERS, Lieutenant
TODD T. SEMONITE, Commanding General and
Chief of Engineers for United States Army
Corps of Engineers; UNITED STATES
DEPARTMENT OF TRANSPORTATION, TODD LaHOOD,

1

Secretary of United States Department of
Transportation; UNITED STATES DEPARTMENT OF
EDUCATION, JOHN B. KING, Secretary of
United States Department of Education; and
UNITED STATES DEPARTMENT OF HOUSING and
URBAN DEVELOPMENT, JULIAN CASTRO, Secretary
of United States Department of Housing and
Urban Development, and JANE DOE and JOHN
DOE as names representing defendants whose
names are not yet known,

                    Defendants.
----------------------------------------

The Plaintiffs, by their attorneys, Kernan Professional Group, LLP, complaining of the Defendants allege as follows:

## I. JURISDICTION and VENUE

1.   This is a class action by individuals (the "Class") who have been disenfranchised and denied entry into paid on-the-job-apprentice training ("OJT") and employment on facilities and projects being constructed by the Defendants in the greater New York City area as persons under and in violation of the Civil Rights Act of 1964, 42 USCA § 2000e-2 (the "Act"), and in breach of the conditions to grants of funds from the United States of America ("Federal Funds") and of rights secured by the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§§1981, 1983 and 1985, by requiring an employer to grant preferential treatment because of race or color in violation of section 703(j) of the Act and in not using the Federal Funds to provide equal employment opportunity in OJT and employment resulting in unlawful employment practices forbidden by section

703(a). Plaintiffs' seek declaratory and injunctive relief to prevent Defendants', officials of the United States of America and New York State and local officials of agencies and authorities, from denying plaintiffs their rights to OJT and employment in connection with public works construction contracts in such a way that it deprives the Plaintiff Class of their rights to become skilled so as to be able to compete fairly for jobs based on ability rather than skin color or ethnicity.

2.    In misusing Federal Fund grants, the Grantee Government Agencies have simply passed the obligations through to contractors with goals and quotas in violation of United States Executive Order 11246, as well as several other federal regulations specifically identified in the grants of Federal Funding, causing and continuing to cause disparate impact discrimination that these statutes, orders, and regulations were designed to remedy, when the Grantee Agencies and Authorities easily could have sponsored apprenticeship under the Fitzgerald Act (29 U.S.C. § 50 commonly known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Bureau of Apprenticeship and Training (BAT) and C.F.R. T. 29, Subt. A, Pt. 29 and Pt. 30, which is preempted for federal jurisdiction under the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 et seq.).

3.    The jurisdiction of this Court is based on violation of these laws, statutes, executive orders, regulations, rules, federal agreements and covenants which establish conditions for

the Federal Funding to the Grantee Government Agencies, and which constitutes a dispute within the jurisdiction of this Court pursuant to 28 U.S.C. §§1331, 1337, 1343, and 1361 and 5 U.S.C. §§702 and 706, 28 U.S.C. §§2201, 28 U.S.C. §1331 and its general jurisdiction under Article III of the United States Constitution.

4.    Venue in this District is proper under 28 U.S.C. §1391 because a substantial part of the events giving rise to the claims made herein occurred in and about the Eastern District of New York. The Grantee Government Agencies received and continues to receive Federal Funding on many facilities and project sites.

## II. The Class Representative and Plaintiff Class

5.    Plaintiff Reginald Benjamin, a resident of Hempstead, New York and New York City for most of his life, brings this action under Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure as a member of the Class of disadvantaged low income or nonexistent income individuals who are fully and capable of learning and to perform and/or performing skilled trade work as apprentices and journeypersons in a class, but have been denied such opportunities because such employment opportunities have been exported to other high income individuals from outside of the New York City area because of the lack of experience of the Class. The low income circumstances in the geographic area surrounding the facilities and projects being constructed by defendants, places the Class members at such a low level because they have been constricted to the low income neighborhood in which their families

live. The said economic circumstances compel children to leave school at an early age in order to help sustain themselves and the family, where fathers who are unable to provide for their families have left in order to maximize public assistance to family members, forcing uneducated children into illegal jobs such as selling drugs just to survive, who only coincidently happen to be black, whose low income economic circumstances tie them to the Class members and other families in the neighborhood, denying them the opportunities they seek for which this action has been brought. These dire economic circumstances can persist for generations, damaging the very fabric of the Class, their families and their neighborhoods.

6. Plaintiff Benjamin speaks herein in the first person because the unfairness and depravity is personal, suffering serious, permanent and irreparable economic and social injury and damage as a result of the actions and/or inactions of the Defendants in not developing less onerous and less offensive alternatives for hiring persons than the disparagement of by color of their skin or ethnicity, when all this does is cause an employer to disregard qualifications and competency and instead select employees on an illegal basis of goals and quotas for society's outcasts defined by Defendant Government Agencies in direct violation of the Act. This illegal disparate treatment is personal and permanent. Plaintiff Benjamin's circumstances are common and

prevalent to the all of the members of the Class.

7.  The following facts are typical to the members of the Class, related by Plaintiff, Reginald Benjamin, are in the first person as I or we, where Plaintiff Benjamin embodies the hardscrabble Class members like him who are deprived of the opportunity to become fully employed as a skilled craftsperson simply desiring the dignity of work:

I may have seen my father . . . once, but never met him. My mother raised my 7 brothers and 3 sisters by herself in an apartment in a hard neighborhood in the South Bronx. We were forced my family and neighborhood poverty to rely of social services and donated food from a convent to survive. It was hard. My mom had to provide for us the best she could. The street eventually became my family.

I grew up in an environment where the street "hustle" was all I knew. From the age of 11 years old, I basically learned the "street game" and lived a life of "hustling" and petty thievery. I learned that if I were to survive I had to be part of a "crew." There were 12 of us and we formed a "street bond" to watch each other's backs. We did everything together. The 12 of us would prowl the streets, breaking into factories, clothing stores, local grocery stores, otherwise wreaking havoc in our neighborhood. Our crew was inseparable and we soon became known as the "DIRTY—DOZEN," after a popular 1970s movie. By the age of 14 I landed in Spotsford Detention Center for young boys under sixteen, which, only cemented my "Bad Boy" street reputation. It was my rite of passage into "Thughood".

By that time, the proliferation of "Street Gangs" was so prevalent that it was impossible for a teenage youth to survive without being a part of a gang. My "crew" evolved into a full fledge gang called the "The Black Pearls." We were predominantly African-Americans, and boasted of a membership exceeding 1000. Young and immature, we never-the-less were street-wise; which was required to survive.

Every gang had rules, honor codes, dues and a hierarchy of authority, a President, Vice President, Warlord, Secretary and a Treasurer. In addition, there were chapters and divisions with Presidents over "Turfs," or neighborhood territories, who

reported back, and paid weekly dues, to the central leadership. All chapter presidents were subordinate to the central leadership which was where the First President, First Vice President, First Warlord, First Secretary and First Treasurer ggoverned. The First Division or Chapter was also the strongest, having the more hardcore, dominant members. It was where "The Dirty Dozens" dominated.

The influence of a gang on the school system was one of the most underestimated aspects of the street gang culture counter-culture. Being loyal to a gang was anathema to getting an education. Gang members spent more time hanging out on the street than going to school. It was not unusual for 13 and 14 year olds to spend days, even weeks at a time, hanging in gang "club houses," which were nothing more than abandon buildings or factories (converted into gangs headquarters). Abandon buildings and factories were so prevalent in the South Bronx that it literally resembled a bombed out Warsaw ghetto.

Gang rivalry or "turf wars" spilled over into the school system, making it life threatening to go to school. If a youth was approached by a rival gang while on his way to school or even in school itself, he stood the chance of being viciously attacked or possibly killed. If a school was located in an area considered part of a gang's "turf," then any rival gang member going to that school ran the risk of being assaulted. At the time, the school simply passed suspected gang members from grade to grade to get rid of them. At the age of 14 I "graduated" to Adlai Stevenson High School, a school in the turf of my gang's biggest rival, the notorious, infamous "Black Spades," the biggest African-American gang in the South Bronx. My gang, although smaller, was notorious for its street smarts and fighting skills. At the time, it did not register that this was simply Black on Black gang violence; both our gangs was predominantly African-American, most of us were former friends or old class mates.

In order to fully understand just how life-threatening it was for me to go to Adlai Stevenson High School oone has to understand the psychic of a gang's rivalry. For starters, the President of the Black Pearls was my older brother, which alone made me a prime target of any rival gang; if they couldn't get to my brother, "taking me out" would have been a great psychological victory. Secondly, the fact that I was the "Supreme Warlord" of my gang, to take me out would have been tantamount to taking out one of the most dangerous members of our gang leadership. As a matter of survival I had learned to project an image of being "crazy." I knew that if people thought

I was crazy and fearless I would less likely be challenged.

Sending me to Adlai Stevenson High School was a death sentence. It was like, either drop out of school or die, of course I dropped out. I was a ninth grade dropout and for the next two years I was a full time gangbanger. I was living a nightmare; fighting, roaming the streets aimlessly, constantly ducking bullets, seeing and hearing of friends getting shot or brutally attacked, wondering when would it be my time to die.

Two months after I turned 16 I, along with eight other fellow gang members were arrested (or as I later confessed, I got rescued!). A rival gang member we had assaulted turned out to be the son of a police officer (a Sergeant!). Make no mistake about it, this kid was a member of a gang, he just happened to be the son of a police officer which meant I was in more than the usual trouble. Street code was that you avoid directly harming police officers and never harm their loved ones, though at that time even sons of police officers got caught up in the gang culture.

The 42nd precinct raided the main headquarters of my gang. My gang's headquarters was in an old abandoned dress manufacturing building near the corner of Third Ave, about a hundred feet from the elevated Third Ave train station.

The elevated train line was a haven for criminal activity and moral depravity. Violent assaults, robberies, muggings, open air illegal drug markets, rampant prostitution, and murder were a perpetual part of this tapestry.

For kids growing up in the South Bronx, this was the norm; it was the only environment we knew. South Bronx kids were entrapped in this impoverished community by an abject racist atmosphere. On a few occasions when we wandered outside the invisible segregated lines we were randomly accosted by hostile police officers who would remind us to go back to "our neighborhood", or be arrested. The residual effect on these hostile encounters with white police officers was the distrust that communities of color harbored toward police.

After turning 16, I was carted off to the 42nd Precinct and held overnight in a crowded holding pen for arraignment on formal charges. At my arraignment, I, along with eight other codefendants, all whom were fellow teenage gang members, stood blankly as the judge read off a list of felony counts; first degree kidnapping, felonious assault, unlawful imprisonment, torture, first degree robbery, and felonious possession of an illegal firearm. In all, we faced 82 years in prison if convicted of all criminal counts. We were remanded on a $450,000 bail

bond.

I was flabbergasted, dazed and confused. At sixteen years old, I couldn't comprehend the magnitude of the trouble I was in. For thirteen months, I was driven back and forth to court, spending endless hours in overcrowded holding cells with older criminal offenders; murderers, rapists, stick-up artists, illegal drug pushers, burglars, carjackers, dope-fiends, and sick and addicted heroin addicts. Watching sick heroin addicts go through withdrawals and convulsions as their bodies violently crave a heroin "fix" was horrible.

I watched men with open wounds that oozed with pus from trying to find retracting veins to satisfy their heroin craving. It wasn't uncommon to see the addicts vomit a horrific vile smelling green substance. We usually spent twelve to fourteen hours in these cells without even seeing our judges or lawyers. I was only being fed stale bologna sandwiches* with cups of colored, sweetened water — which was supposed to be cool-aid. One day, they handed out bags of maggot filled sandwiches. Once we bit into them, maggots were everywhere, and the men started throwing up all over the place. The cell was literally filled with regurgitated food. But the Correctional Officers treated it as routine, just another day in the life of felon detainees. I only saw my legal aid attorney once during my thirteen month stay at Riker's Island Detention Center.

I started to get severe migraines headaches that lasted the entire thirteen months of my odyssey through the court pre-trail system. The dizzying impact from the migraines started to impair my vision.

The Rikers Island complex, which consists of ten jails, holds local offenders who are awaiting trial and cannot afford or cannot obtain bail or were not given bail from a judge, those serving sentences of one year or less, and those pending transfer to another facility. Some 40% of the islands detainees had bails of $1,000 or less, indicating the extreme conditions of poverty these potential convicts face. Nine out of ten inmates waiting for a trial are black or Latino.

As a "street thug" with an unwritten inevitability of one day ending up on "The Rock" as it was infamously known, I was fed a sturdy diet of horrific tales of young men being preyed upon by season criminals; stories of sodomy and rape, violence and vicious assaults, strong-arm robberies, victimization and intimidation. I had heard stories of teenage boys, disappearing, never to be seen or heard from again.

After getting off the prison bus we were led into a large

holding pen where, one-by-one, we were interviewed, fingerprinted and, photographed, given individual jail IDs, separated by age groups, and strip searched. The strip search was a dehumanizing process; you were asked to take all your clothes off, lift your arms, open your month, lift your tongue so that the officer could look under your tongue and down your throat. You then had to lift your private parts and turn around, bend over and spread your buttocks. Next we were forced to take cold showers. I had heard street tales about men being sodomized in prison showers. But for me, I had already resolved to die rather than be sodomized by another man. Once we showered and got dressed, we were ordered to lineup single file for the arduous march down a narrow dimly lit cement-cylinder corridor toward the jail mess-hall. We slowly passed eight cell-block doors, each housing hundreds of jailed detainees. It was not unusual for a person to spend months, even years going back and forth to court as their case dragged through the tediously slow court system. It is a torturous process that is so taxing on psyche that it is not unusual for a person to plead guilty just to end this insufferable ordeal, infamously known as "bullpen therapy" in jail-house vernacular.

Sometimes a person would plead guilty just to end the torturous trial of going back and forth to court, especially if by pleading guilty they would get time serve or at least the satisfaction of knowing that they would soon be released.

Typically, a jail-house detainee is woken as early as 5 o'clock a.m., takes a brief shower, dressed in his/her "court attire," lined up for court call, marched down a narrow corridor to the jail-house mess-hall for a light breakfast, taken to a holding cell, separated into another holding pen depending what court they go to and what borough (Bronx, Queens, Manhattan, Brooklyn, etc.,), ankle shackled to another court detainee, marched by twos onto a prison bus, driven to court (all the while, forced to hear endless, and oftentimes inflated, criminal "war stories."). Once at the court, the detainee is placed in another holding pen, ankle shackles are removed. At some point the detainees is taken to yet another holding pen depending on what Judge they are to appear before. Now comes the hours upon hours of incessant anxiety-prone waiting, wondering "will I see the judge, will I see my lawyer, will they let me go, will I get sentenced, will my family or friends be in court," the list goes on.... All the while you are still surrounded by every criminal element known to man, you included (you look up, it is only 9am!).

Ironically, going to jail was one of the only legitimate

ways a person could leave gangs and the hood (neighbor). But even in jail one had to be a part of a "crew." I joined a black youth group called "The Five Percenters Nation," which in many respects was a counter version of white supremacists. Most African-American inmates were into Black Nationalism which, with the likes of the Black Muslims, the underground weather men, the Black Panthers, Ron Karenga (seven principles of blackness-Mau Mau) was influencing much of the Black American prison population. From the Black Panthers ("Black power"), cultural nationalists like Imiri Baraka, Dick Gregory, Stokely Carmichael and H Rap Brown of SNCC, George and Jonathan Jackson and the Soledad brothers, I learned communism is the high form of socialism, and words like dialectical materialism, the proletariat and the bourgeoisie. It was in jail that learned how to read and I began reading a lot, especially when I was sent to what we called "The Box," or solitary confinement. I became a voracious student of black history and read everything from "Sex to Race" by A.J. Rogers to "The Destruction of Black Civilization" by Chancellor James Williams. I learned of great historical Black figures who made a powerful impact on Black history, from the likes of Frederick Douglas and W.E.B. Dubois, Martin R. Delaney and Booker T. Washington, to Martin Luther King and Malcolm X. But most important, I started reading the Bible.

In prison a guard by the name of Sergeant Klein once said to me that, "You're a smart guy. If you applied yourself you could make something of your life." That was the first time an authority figure said anything positive to me. I still remember him. My mom died while I was in prison, and that was hard on me.

I had a job working in a gas station when I first got out, but after being held up at knife point one night, I realized this wasn't worth two dollars an hour. Before I knew it I was back in prison for selling drugs. With no prospects for work, each time I got out I always ended up back inside.

Years later, when I was released from Groveland Correctional Institution, homeless, with no place to go, still clothed in by prison greens, I rode the New York City number 2 subway train from end to end for two days. After 2 1/2 days, I mustered up the courage to go to my Parole Officer, a Mr. Raphael Simpson (Affectionately called "Mr. Simpson"). I confessed to Mr. Simpson that I really did not have a place to live. Mr. Simpson was kind and, as I was later to learn, was not only compassionate, but a well-respected parole officer. He told me about a stern "no-nonsense" little old Christian woman who ran

a homeless shelter called Mount Eden Rescue Mission. Mr. Simpson told me that if I was serious about getting my life together he would call her and ask her to give me a place to stay. I was cold, hungry and tired, and my feet were still wet from the cold blistering snow-turned-slush. This was one of the lowest points of my life, I realized if my life was going to change, I had to humble myself.

That is how I met Sister Gina Huddleson, the founder of Mount Eden Rescue Mission. Determined to change my life, I began working at the mission as a handyman.

I began doing carpentry, sheet rock, plumbing and minor electrical work. And there was a lot to do. I was outside doing some cement work when a neighbor came by and asked me to help them. Before I knew it, I started an unofficial business and hired eight guys who had some skills but no opportunities. Eventually I was making thirteen thousand dollars profit a month. That's when I realized that if people were given the skills and the opportunity, we could change the negative ripple effect going on in our communities.

Today I run the Able Body of Believers Alliance (ABBA) Leadership Center which runs workshops to connect disadvantaged men and women, many of whom have served time, in jobs it that would provide OJT. The ABBA Leadership Center Inc. is a not-for-profit organization and has demonstrated the just as thug life has a negative ripple effect in communities, OTJ programs have a positive ripple effect. I am living proof that given the opportunity, people will rise to the occasion and opportunity.

ABBA Leadership works diligently to bring hope and restoration to men and women whose lives have been devastated by multi-generational hopelessness and despair. We have come to realize that effective reentry starts from the time of incarceration. Imprisonment has an effect on families and low income communities so reentry means working with the family and children of incarcerated men and women. Community outreach is an extension of jail in-reach.

ABBA provides group support, including individual mentoring, family meditation, and educational direction and employment opportunities.

For example, as recently as Tuesday, September 24th, I workshopped with the Jobs and Careers Center's Apprenticeship Training Program at the SUNY Maritime College in the Bronx to make sure that our local workers have the skills, opportunities and resources they need to benefit from jobs.

Many of us from communities in poverty are excluded from prevailing wages jobs and apprenticeship programs because there is a perceived skills deficit. The Jobs and Careers Center, who has a history going back to 1984 of working with and placing disadvantaged workers into apprenticeship positions, also operates continuing education programs so that local workers have the current skills necessary to work.

Because many local contractors don't have access to surety bonding and therefore struggle to provide jobs in our community, we have created a comprehensive program to provide the skills and bonding needed. This program has been presented to our government agencies. We have focused on providing private solutions, and where appropriate, partnerships between the private sector and government agencies to confront today's chronic unemployment challenges. By forming a coalition of private companies and not-for-profits, we seek to link disadvantaged workers to paid apprenticeships with established employers.

Public works projects demand a certain portion of work go to us. But the way the system operates presently, it invites fraud and has resulted in fines and even prison sentences for general contractors. Our program helps businesses compete and win public works projects while staying within the law. It is a powerful tool for job creation in communities that desperately need them.

ABBA is located in the metropolitan New York City area. We focus on helping disadvantaged men and women establish careers, reuniting them with their families to combat the negative influence of drugs, crime, violence, gangs and poverty. Biblical principles are the building blocks of all our teaching.

Pivotal to ABBA is reaching men and women entangled in the criminal justice system in order to reduce the high rate of recidivism. ABBA and I are working to develop a comprehensive strategy to rebuild the broken lives of men and women in crisis situations; be it jail, homeless shelters, drugs and alcohol program or the "average Joe" aimlessly going through the motion of life.

Once a man or a woman enter the criminal justice system the odds of them getting a decent job is practically nil. Compound that with the current state of the economy and the odds are virtually impossible. Today a wife may look to a man to be the bread winner but things are so bad she has to lie to the "Welfare system" to feed him and the kids!

THE GOOD NEWS:

In spite of the fact that the world has seemingly rejected these men and women, ABBA Leadership Center works to usher in a spirit of hope, deliverance and restoration into the lives of those despised and rejected by a callous cynical world.

On Wednesday, MAY 23, 2013 FROM 10 AM TO 12 ABBA held the third in a series of job readiness, life skills training workshops for hard-to-employ young men and women. On July 19th, 2014 ABBA held the fourth workshop.

The training and placement program has become massive, with a registration list of 228 and thousands of waiting to participate in the workshops. These programs continue.

Plaintiff Benjamin as a member of the Class is a proper representative of the Class. His personal and business interests and the claims hereinafter set forth are fully aligned with those of the Class.

8.    Class Member Angela Garvey - Electrician at Mechanical Electric, residing at Brooklyn, New York, told me her story that demonstrates the course-altering success from the same OJT Program we introduced to the Grantee Government Agencies' and Authorities:

She was born in Coney Island and eventually moved to Bedford Stuyvesant, Brooklyn. Mom and Dad both worked and she had a brother who was a lot older and her parents were much older. She used to do odd jobs like work in security, and as financial secretary at her church, while she took care of her mother and father. She always wanted to do construction type of work, but didn't have the opportunity until her father passed away. A friend told her about Mechanical Electric and she told them she didn't know anything about electrical but was willing to learn anything they were willing to teach her. They gave her a chance and she has been part of the OJCC program since. Once she started the apprenticeship program her income went to twice as much. She's now in her third year. The more she learns the more they let her do. She thinks the apprenticeship is a great program. And to demonstrate the positive ripple effect of this program, now her nephew has something to look forward to. Now he wants to do what she does.

9.    Class Member Ruthhassant "Terry" Ramcharitar – Carpenter for Divine Construction, Inc., residing in Queens, New York, told

me his story that demonstrates the course-altering success from the same OJT Program we introduced to the Grantee Government Agencies' and Authorities:

> He was born in Guyana, a small country between Venezuela and Brazil. When he was 16 he was sent to live with his aunt in Trinidad. There he got married and had three daughters. When he turned 40, he got his (US) immigration papers and moved with his wife and daughters to Queens NY. He lived in a basement apartment and his first job was wrapping furniture for minimum wage but only for three days a week. He couldn't support his family so he took a job making sandwiches at a Bagel shop. Eventually he became a security guard at a cemetery doing the midnight shift. It was not good work. Then a friend told him about Devine Construction. He had no experience but told them he would work hard. He worked as an unskilled laborer. He was hauling debris and doing demolition. Then his boss said someone needs to go to an apprenticeship program and he asked him. He agreed and learned a lot there. Now he goes to jobsites and has become a boss and makes more money too. The other guys who were working with the company before him are still unskilled laborers because they never had the opportunity to learn like him. They still do demolition. Because he continued with the apprenticeship program he keeps elevating and moving up. He does skilled work which he is proud of. Often he shows his boss the right way to do things, the way he has learned as an apprentice. He would still be moving out garbage if he didn't go to OJCC. He bought a house within seven years of being in this country. He is proud to say he is the American Dream.

10. Carl Evans has succeeded in raising himself from low income despite his economic environment so weighing against the low income Class members, and was able to lift himself to become the skilled construction trades and part of, worked for, and project managed, and he is now able to attempt to rectify the plight of the Class. Their plight can be corrected to begin with employment opportunities using OJT which can only happen by the use of Federal Funds.

11. Evans joining with Plaintiff Benjamin, and with Irving Hurdle, Webster Gillory, Walter Fauntroy, Roger Edmunds, Anthony

Robinson, and Lynette Barnhardt, (referred to hereinafter as "we" and the "Solution(s) Advocates"), comprise a team who have presented solution(s) to the Defendants, as hereinafter described, with respect to apprenticeship and continuing education, all to no avail because the Defendants' officers and executives were unable or declined or refused to influence the Defendant Government Agencies and Authorities who have remained apathetic to the plight of the Class.

### III. The Defendants

12. The following Defendants hereinafter referred to as Grantee Government Agencies are all organizations who have received grants of Federal Funds but have failed to use of the Federal Funds to improve the employment opportunity to the Class:

a) Defendant Empire State Development Corporation ("ESDC"), guided by Defendant Zemsky as its President and CEO, promotes a vigorous and growing state economy, encourage job creation through the efficient use of loans, grants, tax credits, real estate development, marketing and other forms of assistance, ESD is focused on strengthening New York State's innovation-based economy through partnerships with universities, promoting entrepreneurialism through the development of incubators, next-generation manufacturing and technology hubs across the state and providing hands-on technical and financial assistance.

b) Defendant New York and New Jersey Port Authority, ("Port Authority") guided by Defendant Foye as its executive

director, is a political authority of the States of New York and New Jersey.

c) Defendant Dormitory Authority of the State of NY, ("DASNY") guided by Defendant Bushell as its Executive Director, is a facilities finance and construction authority of the State of New York, utilizing Federal Funds and issuing tax-exempt bonds for public agencies and private not-for-profit institutions.

d) Defendant Metropolitan Transportation Authority, ("MTA") guided by Defendant Prendergast as its Chief Executive Officer, is a public benefit corporation responsible for serving a population of 15.3 million people in the 5,000-square-mile area fanning out from New York City through Long Island, southeastern New York State, and Connecticut utilizing Federal Funds for its facilities and projects.

e) Defendant New York City Housing Authority, ("NYCHA") guided by Defendant Olatoye as its Chief Executive Officer, utilizes Federal Funds on a mission to increase opportunities for low- and moderate-income New Yorkers by providing safe, affordable housing and facilitating access to social and community services.

f) Defendant the New York City School Construction Authority ("School Construction Fund"), guided by Defendant LaRocca as its Executive Director, utilizes Federal Funds to manage design and construct public schools for children throughout the many communities of New York City.

g) Defendant the New York State Department of Transportation ("NYSDOT"), guided by Defendant Driscoll as its Commissioner, is a government authority utilizing Federal Funds for the development and operation of transportation systems in the State of New York, ensuring those who live, work, and travel in New York State have a safe, efficient, balanced and environmentally sound transportation system.

h) Defendant the New York City Department of Transportation ("NYCDOT"), guided by Defendant Trottenberg as its Executive Deputy Commissioner, is an agency using Federal Funds to provide for the safe, efficient, and environmentally responsible movement of people and goods in the City of New York and to maintain and enhance the transportation infrastructure.

i) JANE DOE and JOHN DOE as names representing defendants whose names are not yet known.

13. The following Defendants hereinafter referred to as Grantor Government Agencies are all organizations who have distributed grants of Federal Funds but have failed to police, monitor and audit the use Federal Funds so as to be available to improve the employment opportunity of the Class:

a) Defendant the United States Environmental Protection Agency ("USEPA"), guided by Defendant McCarthy as its Administrator, is a federal authority for protecting human health and the environment.

b) Defendant the United States Department of Defense ("USDOD"), guided by Defendant Carter as its Secretary, is an executive branch of the federal government responsible for coordinating and supervising national security.

c) Defendant the United States Army Corps of Engineers ("US Corp"), guided by Defendant Semonite as its Commanding General and Chief of Engineers, is a federal agency under the DOD delivering vital public and military engineering services.

d) Defendant the United States Department of Transportation ("USDOT"), guided by Defendant LaHood as its Secretary, is a federal cabinet department designed to serve the United States by ensuring a fast, safe, efficient, accessible and convenient transportation system.

e) Defendant the United States Department of Education, ("USDOE") guided by Defendant King as its Secretary, is a federal agency responsible for establishing policies on federal financial aid for education, and distributing as well as monitoring those funds.

f) Defendant the United States Department of Housing and Urban Development ("USAHUD", guided by Defendant Castro as its Secretary, is a federal authority on public housing in the United States focused on advancing policies that create opportunity for folks across the country supporting community development, and increase access to affordable housing, free from discrimination.

g) JANE DOE and JOHN DOE as names representing defendants whose names are not yet known.

## IV. Facts

14.  The 1964 Civil Rights Act 42 U.S.C. § 2000(e) (1964) (the "Act") is a material condition of government contracts, as important as providing steel for a building or gravel for a road. The purpose of this litigation against the Government Agencies is not to attempt to outlaw goals or quotas but to enforce the provisions of the Act for the benefit of the Class, and which are incorporated into the Master and Grant Agreements, whereby federal funds are awarded to Grantee Government Agencies. All Government Agencies involved in the chain of funding, beginning with Federal congressional appropriation, to the Executive Office of Budget & Management allocation, to the Executive Cabinet Agencies. Grantor Government Agencies, who distribute the funds, to the local, state and federal agencies and authorities, Grantee Government Agencies, who enter into grant and master agreements to receive Federal Funds, and then contract with contractors who build and are paid from the grant of Federal funds. The Government Agencies as stewards of the Federal Funds, are required to live up to the intent of the Act – to be colorblind.

15.  Executive Order 11246 seeks to implement the anti-discrimination program of the Act and is directed at all government contractors. Section 2 02(1) of the Order provides: The contractor will take affirmative action to ensure equal employment opportunity. Such action shall include but not be limited to the

following: employment upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship, 30 Fed. Reg. 12,319 (1965), the "color blind" approach envisioned in E.O. 11246.

16. § 202(1) of Executive Order 11246, 30 Fed. Reg. 12,319(1965), provides that: The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include but not be limited to the following: employment upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

17. Although this Complaint identifies that not only are equal employment goals or quotas illegal, but they are disparaging, corrupting and evil, propagating fraud and criminal activity (Reference Grand Jury Report from New York County issued in 2014 finding systematic criminal conduct in minority business enterprise contracts). Contractors have been prosecuted and convicted for wrongfully attempting to satisfy the goals and quotas.

18. Quotas are being used for equal employment opportunity apparently due to the mistaken view by the Defendants that there

is no less onerous alternative for achieving the purpose, allowing unequal treatment based upon the color of skin or ethnicity under the guise of equalizing employment opportunity, when in fact there is a more beneficial and constitutional solution available.

19.  The Government Agencies must sustain a very heavy burden of justification to show that there are no less onerous alternatives for achieving that purpose,

20.  The Government Agencies have conspired, shifted and passed the burden to comply with the Act to the contractors building facilities by requiring goals as affirmative action, but that has simply spawned fraud and criminal activity. Unfortunately, using goals, the contractor is irresistibly drawn to look to the race or national origin of individual applicants, and such race or national origin proves to be the decisive factor in deciding whether or not to hire an individual. Such racial considerations are specifically outlawed by two separate sections of the 1964 Civil Rights Act: Section 703(a) dealing with individual discrimination because of race, and Section 703(j) dealing with preferential treatment of individuals or groups of individuals. Section 703(a) of the Act requires each individual to be treated without regard to race or national origin as a determinative factor in the decision to hire workers, it crosses over into the restricted bounds of quotas and individual discrimination as prohibited by Sections 703(a) and 703(j). The Act prohibits such goals which are no more than quotas. In order to meet quotas an employer has to hire a black or brown man rather than a whiteman even though their job "credentials" are not as

22

impressive, whereas upgrading those credentials allows the disadvantaged person to compete based upon skill rather than the color of their skin or ethnicity, Section 703 (a) 42 U.S.C. §§ 2000(e)-2(a) makes such conduct unlawful.

21. Further exasperating the inequity, automation and new technology are combining to raise the level of unemployment and promise to result in less and less opportunity for the lower or nonskilled class, which it turns out nonwhites make up a disproportionate share.

22. The most beneficial and constitutionally correct solution that is certainly a less onerous alternative to address and correct the inequity and foster equal employment is for the Grantee Government Agencies, is to provide paid OJT and continuing education as obligated by the Grantee Government Agencies because of their acceptance of the grant of federal funds. The Grantee Government Agencies are not relieved from their obligations under the Act by passing the burden through to contractors and builders.

23. The Solution(s) we as Advocates have presented to the Grantee Government Agencies to answer the need for the Class to obtain competitive skills is by utilizing registered apprenticeship training meeting the requirements of the Fitzgerald Act (29 U.S.C. § 50 commonly known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Bureau of Apprenticeship and Training (BAT) and C.F.R. T. 29, Subt. A, Pt. 29 and Pt. 30, New York Labor Law Article 23 Apprenticeship Training and Labor Law §811, NYCRR Part 600 Equal Employment Opportunity in Apprenticeship Training and Part 601

Registration of Apprenticeship Programs and Agreements. Apprenticeship is the process of learning a skilled occupation through both on-the-job training (practical, paid experience) and learning the related technical knowledge in a classroom. You must be 18 years old, and possess a GED (the program will help a candidate obtain a GED). Enrollment must be done openly under the procedures established by federal and state regulations for Minimum Qualifications Review, Eligibility List Ranking using Form AT507 and AT508 for: educational achievement, work experience, seniority, job aptitude, oral interview, and demographics determine a score for ranking for eligibility to be enrolled in OJT and continuing education. The Solution is part of wrap-up workers compensation insurance which will develop the skills of the Class of persons recruited from within communities mired in poverty to be able to compete for paid OJT with related classroom instruction and continuing education provided as part of risk management, loss control and safety training within Owner Sponsored Insurance Programs for workers compensation insurance which is provided by Grantee Government Agencies under New York Insurance Law §2504 wrap-up insurance as a mandated coverage provided by the Grantee Government Agencies for which the contractors take credit against their individual workers compensation policies so there is no extra cost to the contractor, (the "Solution").

24. The apprenticeship program portion of the Solution is the process of learning a skilled occupation through both on-the-job training (practical, paid experience) and learning the related

technical knowledge in a classroom. You must be 18 years old, and possess a GED (the program will help a candidate obtain a GED). Enrollment must be done openly under the procedures established by federal and state regulations for Minimum Qualifications Review, Eligibility List Ranking using Form AT507 and AT508 for: educational achievement, work experience, seniority, job aptitude, oral interview, and demographics to determine a score for ranking for eligibility to be enrolled in  OJT and continuing education. The Solution is part of wrap-up workers compensation insurance which will develop the skills of the Class of persons recruited from within communities mired in poverty to be able to compete for paid OJT with related classroom instruction and continuing education provided as part of risk management, loss control and safety training within Owner Sponsored Insurance Programs for workers compensation insurance which is provided by Grantee Government Agencies under New York Insurance Law §2504 wrap up insurance as a mandated coverage provided by the Grantee Government Agencies for which the contractors take credit against their individual workers compensation policies so there is no extra cost to the contractor, (the "Solution").

25.   The Solution is ideally suited to train and create jobs for the Class of disadvantaged persons. The Apprentice Program as the Solution is an outgrowth of a commitment to minimize loss and risk in the work place by educating and training apprentices and journey persons on safe and healthful practices, worker's safety is impacted in a positive manner resulting in greater control of risk reducing loss for employers and their carriers.

26.  An acceptable apprenticeship program is vigorous and comprehensive and takes many years for an apprentice to fulfill the requirements as established by the US Bureau of Apprenticeship Training and the New York State Department of Labor by means of approved work processes as Appendix A On-the-job training and Appendix B related classroom instruction.

27.  On many facilities and projects of Grantee Government Agencies wrap-up workers compensation insurance is a part of the Contract and would be an ideal mechanism within which to fit OJT apprentice training as to foster equal employment opportunity with outreach by sponsors. The Grantee Government Agencies have been complacent to establish a solution which actually provides jobs and careers to the Class.

28.  We presented the Solution(s) to Lash Green, Diversity Officer of the Port Authority, and to past Executive Director Chris Ward proposing that the Port Authority adopt and sponsor the Solution but the Port Authority has remained apathetic to the plight of the Class and have not taken steps to correct the disparate treatment to the Class.

29.  We presented the Solution to Michael J. Garner, Chief Diversity Officer of the MTA, proposing that the MTA adopt and sponsor the Solution but the MTA has remained apathetic to the plight of the Class and have not taken effective steps to correct the disparate treatment to the Class.

30.  We presented the Solution to ESDC director and the Deputy Commissioner for Community Economic Development, for presentation to Gov. Andrew Cuomo proposing that the ESDC adopt and sponsor the

Solution but the ESDC has remained apathetic to the plight of the Class and have not taken effective steps to correct the disparate treatment to the Class.

31. We presented the Solution to DASNY Diversity Officer Paul Williams, proposing that the DASNY adopt and sponsor the Solution but the DASNY has remained apathetic to the plight of the Class and have not taken effective steps to correct the disparate treatment to the Class.

32. We presented the Solution to Governor David Patterson at a meeting arranged by Clemmie Harris, proposing that the State of New York adopt and sponsor the Solution but the DASNY has remained apathetic to the plight of the Class and have not taken effective steps to correct the disparate treatment to the Class.

33. We presented the Solution to School Construction Authority proposing to acquire a qualified General Contractor to be the Sponsor of the Apprenticeship Program and OJT through Monitor Thacher & Associates proposing that the School Construction Authority and MTA adopt and sponsor the Solution but the School Construction Authority and the MTA have remained apathetic to the plight of the Class and have not taken effective steps to correct the disparate treatment to the Class.

34. We presented the Solution to Chairman Carl McCall of the State University of New York for presentation to state Government Agencies for the State University of New York to partner with us to provide the Solution, proposing that state Government Agencies adopt and sponsor the Solution but the State has remained apathetic to the plight of the Class and have not taken effective steps to

correct the disparate treatment to the Class.

35.   The Solution was first presented to the U.S. Department of Labor Employment Standards Administration for review in 1984 and was accepted on June 14, 1984 as an appropriate apprenticeship program for Wage and Hour Davis-Bacon purposes as qualifying under the US Department of Labor Bureau of Apprenticeship Training.

36.   The Solution was registered with the New York State Department of Labor effective January 1, 1991 which registration has never been revoked.

37.   The Solution is ideally suited to train and create jobs for the Class of disadvantaged persons. The Apprentice Program is an outgrowth of a commitment to minimizing loss and risk in the work place by instruction of apprentices and journey persons on safe and healthful practices, worker's safety is impacted in a positive manner resulting in greater control of risk reducing loss for employers and their carriers.

38.   In 2002, we managed pre-apprenticeship with the NYCHA to provide pre-apprenticeship training in Far Rockaway, New York as preparation for entry into full Apprenticeship using the Solution, until the program was not renewed by NYCHA.

39.   We explained the transformational changes taking place in every industry, tradespersons are requested to keep abreast of technological developments, regardless of age or position in an organization – this has never been more important and represents a powerful key to unlock equal employment. This is an opportunity to give disadvantaged persons the skills to compete and make them desirable to hire based upon their capabilities rather than the

color of their skin or ethnicity. This is not accomplished by the swipe of a pen or a provision in a contract. Instead it will take time to infuse the skill and training to give naturally intelligent and industrious persons wanting to improve their lives and move out of poverty into the middle class the opportunity, this is just good business. Yet the Government Agencies have spent over 50 years attempting to enforce goals and quotas which have miserably failed, and well they should fail because the goals and quotas flow from a forced interpretation of the vision of the Act and the 14th Amendment to the US Constitution - equal protection. The goals and quotas are just plain contrary to law and it is obvious that the illegal activity has caused very little good.

40. There is a significant difference between OJT and education or training. In order to succeed in today's world of nearly instantaneous and constant technological change, it is important to have both, and to ensure that we, the Class, receive the best training and education. It's the only way to stay on top today, while preparing for, and building, for tomorrow.

41. OJT is distinguished from education. OJT teaches and education provides tools to continually adapt to changes. An ancient truism says that if you give a man a fish, you feed him for a day, and if you teach a man to fish, you feed him for life. We go a step further: don't just teach him how to catch a fish, educate us about the art and science of fishing. Go beyond the mechanics of catching a fish and enlighten us by explaining the biological forces underlying the key elements of fishing. Give us the big picture. Teach us the reasons behind the design of the

equipment. Teach us about water currents, patterns in fish mating and feeding cycles, including economic and environmental trends that impact the life-cycles of fish.

42.   This clichéd old saw about the fishermen illustrates the divide between training on-the-job (OJT) and education. OJT is skill-oriented: It's learning how to fish. Education is concept-based — it's learning to see the big picture of why and how things work together. Both are necessary but without OJT he Class never gain the experience to get a job and cannot get a job due to lack of experience.

43.   Training someone to do something is task-oriented. It is skill-based. You can train someone to increase their proficiency. A trained person is faster, better able to perform tasks competently and safely. OJT has a skill-based focus. You train people for performance. You educate people for understanding. OJT takes full advantage of the new tools and systems coming onto the market by manufacturers.

44.   OJT is the not only less onerous alternative, it is the most beneficial and constitutionally acceptable, and is just good business.

45.   Grantee Government Agencies, as the sponsor and grant recipient under master agreements and grant agreements (hereinafter "Grants") with the United States of America, have accepted Federal Funding ppursuant to the terms and conditions of accepting such Federal Funding the Grantee Government Agency must certify that it will legally, financially, and otherwise be able

to assume and carry out the certifications, representations, warranties, assurances, covenants and other obligations required by the Grants which require the Defendants to employ these funds to accomplish equal employment opportunity for the economic benefit of the Class.

46. As a result of the Defendants' failure to comply with the terms of Grants, the employment rate of the Class is still significantly lower than that of other demographic groups, although this wasn't always the case.

47. By coincidence the black population make up a majority of the Class but this litigation does not offer that race designation in support of this action, in fact it is abhorrent to the constitutional principles upon which this action is based. Nevertheless, in 1969, the employment rates for men between the ages of 20 and 24 were about 77 percent for blacks and 79 percent for whites. By 2012, the employment rate for young men in the Class dropped to less than 50 percent, while young white men were about 18 percentage points higher at almost 68 percent.

48. The cycle of destruction starts with chronic, mass unemployment and poverty. Real incomes for the majority of the working poor actually fell significantly during Clinton's second term in office. After the 1996 welfare act, the Great Society era's social safety net was largely pulled apart. As the Bush administration took power, chronic joblessness spread to Black workers in the manufacturing sector. By early 2004, in cities such as New York, fully one-half of all Black male adults were outside

of the paid labor force.

49. Joint Economic Committee - Senator Charles E. Schumer (D-NY) – Chairman reported: little education means joblessness for many young black men. High unemployment rates together with low labor force participation means that a very high percentage of black male dropouts are not working. The percentage of this group that was either unemployed or not in the labor force reached 72 percent in 2004, up from 65 percent from just four years earlier.

50. Despite federal funding poured into Grantee Government Agencies for decades, large clusters of us, the members of the Class of unemployed, unskilled, poor and disenfranchised communities, are surrounded by the very public works projects for whom the federal funding was intended to assist. The impact of this disparate treatment in these disenfranchised communities resulting from the failure of the Grantee Government Agencies to fulfill the obligations of its agreements, covenants, and conditions upon which federal funding was granted, is documented with the following:

Exhibit "1" displays New York City census tracts in which the Class population is greater than 50 percent of the general population and this population's proximity to major Grantee facility sites.

Exhibit "2" displays New York City census tracts in which more than 50 percent of the population is considered low or moderate income according to the Department of Housing and Urban Development. The map also shows the proximity of the low or

moderate income areas to Grantee facility sites.

Exhibit "3" displays (in black) New York City census tracts in which 50 to 100 percent of the general population is defined by HUD as Low-Moderate income and this population's proximity to three major PANYNJ sites. The census tracts in which black and Hispanic families with income less than $40,000 are represented by the hatch areas.

Exhibit "4" displays New York City census tracts in which the unemployment rate is greater than the city average and their proximity to major Grantee facility sites.

Exhibit "5" displays New York City census tracts in which the population with no college education is above average as well as the density of the population age 25 and older that has no college education.

Exhibit "6" displays New York City census tracts in which an above average number of people live below the poverty level and their proximity to Grantee facility sites.

Exhibit "7" displays New York City census tracts in which a greater than average number of households are on public assistance and these households' proximity to Grantee facility sites.

Exhibit "8" displays New York City census tracts in which more than 28 percent of Black Families earn less than $40,000 and this population's proximity to Grantee facility sites.

Exhibit "9" displays New York City census tracts in which an above average percentage of Hispanic families are earning less than $40,000 and their proximity to Grantee facility sites.

51.  These Grants, for the benefit of the Class of us,

requires Grantee Government Agencies to comply with all federal laws, regulations, executive orders, policies, guidelines, and requirements applicable to the acceptance and use of federal funding including but not limited to: the Act, Executive Order 11246, 49 CFR Part 21-Discrimination in Federally-assisted Programs and Effectuation of the Act.

52. Grantee Government Agencies as grant recipient are required to provide specific assurances which were included in the grant agreements, including but not limited to New York New Jersey Port Authority facilities identified as: 1) The LaGuardia Airport site, the 2) John F Kennedy Airport site, 3) the World Trade Center site and 4) Newark-Liberty Airport site.

53. The Government Agencies have failed to provide a mechanism which enables disenfranchised persons to gain experience on-the-job and join the gainfully employed workforce. Passing off these requirements is an illegal attempt to circumvent the requirements of the law and the Grants.

54. The Government Agencies have conspired, obfuscated, shirked and simply delegated the responsibility for the enforcement of these regulations, which protect the Class.

55. The Class has consistently been deprived of the opportunity to obtain employment under the facilities and projects which receive federal funding. Systematic racial discrimination existing in the surety bonding of business enterprises who are

qualified to perform public works projects and encounter this disparate impact due to pervasive and persistent institutional discrimination placing the Class at a disadvantage in financing procurement, capital acquisition, obtaining experience and competency to safely perform work, all of which are programs intended to be aided by the federal funding.

56.  Lower socioeconomic communities such as the Class face disproportionate exposure. Coincidentally, disproportionate number of blacks among the disenfranchised remains a huge racial justice problem. The Class from disadvantaged neighborhoods have been continually kept out of the major trades, which is not just a relic of past discriminatory practices, but the continuation of present-day conspiracy of separation.

57.  The Government Agencies' negligent, capricious, conspiratorial and prejudicial actions in depriving the Plaintiff Class the equal opportunity has been covered up by acquiescing, sanctioning and inducing the use of some minority business enterprise contractors only as fronts in order to appear to satisfy the legal requirements of hiring the identified minority and disadvantaged and thus fail to place the Class on a level playing field and deprive us of vast numbers of real employment and business opportunities.  Even when large majority-owned firms are prosecuted for establishing fronts, they are continually rehired by the Grantee Government Agencies, further entrenching discriminatory behavior.

## V. The Class Action

58.  Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, this action satisfies the requirements to proceed as a Class action, as follows:

(a) The Class numbers in the thousands as a class who have attended ABBA workshops and hundreds who stand ready to go to work. It is therefore so numerous that joinder of all members is impracticable.

(b) Class member claims are typical of the Class, in that each individual has been unfairly and historically discriminated against and denied employment and participation in Grantee Government Agencies' projects based upon the Defendants' actions as described herein. The questions of law and fact are common to the Class regarding the United States Constitution, the Civil Rights Act of 1964, United States Executive Order 11246, 49 CFR 18.36/2 CFR 200.321, and 49 CFR 21, 23, and 26 and the several federal regulations discussed herein are being violated against us as a Class as intended beneficiaries of the Grants with Grantee Government Agency contracts. The Defendants have acted and refused to act on grounds generally applicable to the intended Class, thereby making injunctive and declaratory relief appropriate with respect to us as a Class as a whole.

(c) The Plaintiff Benjamin will fairly and adequately protect the interests of the members of the Class. Benjamin has no conflict of interest with the members of the Class, and the Plaintiff Class is represented by a competent legal team experienced in Class action civil rights litigation and is working with the Minority

Business Enterprise Legal Defense & Education Fund ("MBELDEF"), an organization that seeks to protect the civil rights of disadvantaged persons, including the right to equal employment opportunity.

(d) Class Representative Benjamin is unemployed seeking employment from his offices at Queens, New York.

## Judicial Economy

59.  This action avoids the prosecution of separate actions by multiplicity of actions involving the same individual members of the Class and the same Grantee Government Agencies which would create a likelihood of inconsistent or varying adjudications with respect to individual members of the Plaintiff Class.

60.  The Defendants, individually and collectively, alone and in concert with other still unidentified parties, cloaking themselves under the color of law, utilized and are still utilizing all the power of their government offices, in capricious and conspiratorial disregard to deny and to inflict damages on the Class without justification. The Class have been denied and deprived of an opportunity to compete effectively within the American free enterprise system and as a result The Class have sustained serious and ongoing damages, and if the wrongdoing of the Defendants is not enjoined and prevented, the damage will be permanent.

61.  Consequently, this action is brought as a private attorney general action to enforce certain federal laws, contracts, commitments, obligations and covenants to provide equal

37

employment to correct disparate impact being caused by the neglectful use of Federal Funds tthereby impacting not only the Class but as well the general public good of equal employment opportunity. The Department of Justice has failed to move against the Defendant Government Agencies which were the Grant Recipients, to enforce the covenants imposed upon the Grant Recipients to use Federal Funds in such a way that accomplishes equal employment opportunity.

62. By reason of the foregoing wrongdoings of the defendants, Plaintiffs as a Class have sustained serious, irreparable, continuing damages with no adequate remedy at law.

## As and for a First Cause of Action

63. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

64. The acts of Defendants and each of them are in violation of the Civil Rights Act of 1964, 42 USCA § 2000e-2.

## As and for a Second Cause of Action

65. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

66. The acts of Defendants and each of them are in violation of Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§§1981, 1983 and 1985.

## As and for a Third Cause of Action

67. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

68. The acts of Defendants and each of them are in violation

of Executive Order 11246.

**As and for a Fourth Cause of Action**

69.  The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

70. Defendants Grantee Government Agencies as Grant recipients, breached the grant agreements by failing to comply with all federal laws, regulations, executive orders, policies, guidelines, and requirements applicable to the acceptance and use of Federal Funds as herein before set forth, all to the damage and detriment of the Class.

71.  This wrongful and improper violation of the law by the Defendants creates barriers which cannot be allowed to continue when the real and ultimate result is permanent irreparable serious damage to a protected class under the Constitution and federal law and as intended beneficiaries under the Grants.

72.  The Class, as the intended beneficiaries of the Federal Funding described herein, are entitled to an accounting relative to the Defendants' Compliance with the Grants described herein, and specifically are entitled to an accounting regarding Defendants' utilization of Federal Funds in compliance with the civil Rights Act of 1964, 49 CFR 21, 49 CFR 23, and 49 CFR 26, as well as Executive Order 11246.

73.  Plaintiffs are also entitled to an accounting as to how Defendants calculate both their compliance with these statutes and regulations, and, how they calculate and implement their required encouragement of "affirmative action". Upon information and belief, Defendants have no such methodology, and have failed to

comply with both the very letter and spirit of these laws, which were intended for the direct benefit of the Class.

74. We have been unable to obtain this information as to compliance with the laws and efforts pursuant to the spirit and letter of the contracts and statutes referenced herein.

75. Plaintiffs' request a full accounting as well as declaratory relief from this Honorable Court that they are entitled to this information, and that the Defendants be ordered to provide the same.

## **The Prayer for Relief**

WHEREFORE, Plaintiffs request that this court grant the following relief:

A. Enter a declaratory judgment declaring that the acts of the defendants and each of them to be in violation of the Plaintiffs' rights to equal employment and enjoin the Defendants and each of them from further violation of such rights.

B. Enter an order in the nature of a mandamus enjoining Defendants to provide an accounting of their acts.

C. Enter an order enjoining any further payment of Federal Funds under grants to Defendants until Defendants have implemented corrective policies and procedures, conditions, covenants and obligations as asserted in this complaint so as to prevent the further waste of Federal Funds by officials of the Defendants, and from denying the Class their right to employment in connection with public works contracts through Defendants' continued failure to abide by agreements, covenants, statutes, regulations, executive orders and other federally approved provisions

guaranteeing the right to such equal employment, and that Defendants provide an actual accounting providing actual evidence of the employment of the Class of members of the disenfranchised, and, pray that this Court enjoin any further payment of Federal Funds to Defendants until Defendants have cured the breach of agreements, conditions, covenants and obligations as asserted in this complaint and have mitigated the ongoing damage to us and the waste of Federal Funds by taking remedial to correct it's past wrongful conduct,

ALL together with such other and further relief as shall seem just and proper under the circumstances.

A JURY TRIAL is respectfully demanded in conjunction with the allegations made in this Complaint.

DATED: at New York, New York on this 15th day of December, 2016.                         KERNAN PROFESSIONAL GROUP, LLP

By:  s/James M. Kernan
James M. Kernan, Esq.
Bar Roll No. JK1242
Office and Post Office Address
26 Broadway, 19th Floor
New York, New York 10004
Telephone:  (212)986-3196
Facsimile:  (212)656-1213
jkernan@kernanllp.com